MANSFIELD, Plaintiff-Respondent, v. SMITH, Defendant-Appellant.†

Supreme Court

*No. 76–316. Submitted on briefs March 28, 1979.—
Decided May 1, 1979.*
(Also reported in 277 N.W.2d 740.)

† Motion for reconsideration pending. This motion was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

578

For the appellant the cause was submitted on the brief of *James F. Bakken* and *Bakken, Feifarek & Taylor* of Madison.

For the respondent the cause was submitted on the brief of *M. W. Bieber* and *Johnson, Bieber & Swingen* of Madison.

BEILFUSS, C. J.   On August 7, 1973, Clark Mansfield, a licensed real estate broker, and John Smith, a building contractor and owner-seller, entered into a written real estate listing contract for the sale of a 24-unit apartment building located at 1911 Pike Drive in the Town of Fitchburg, Dane county, Wisconsin.  Under the terms of the agreement the broker was to procure a purchaser for the property at a cash price of $430,000 or at any other price or upon any other terms accepted by the seller during the term of the contract.  Smith, the seller, agreed to pay a broker's commission which amounted to five percent of the sales price.  This figure was subsequently reduced to a flat commission of $15,000.  Originally for a term of three months, the contract was extended by the parties to February 7, 1974 in a separate written agreement dated October 31, 1973.

The listing contract, supplied and prepared by the plaintiff-broker, was a standard form contract employed by Wisconsin real estate brokers. The contract also contained a provision for liquidated damages at the seller's option in the event of a default by the buyer.[1] This clause read in full as follows:

"If buyer of said property should fail to carry out his agreement, and SELLER elects to take as liquidated damages all money paid by buyer, then such money shall be applied first to reimburse BROKER for cash advances made by him and one half of the balance, but not in excess of the agreed commission shall be paid to the BROKER as his full commission in connection with said transaction and the balance shall belong to the SELLER; said payment to BROKER shall not, however, terminate this listing contract."

Mansfield's efforts to procure a purchaser for the property took place over the period from early November to the end of December in 1973. On November 2, 1973, Mansfield received an oral offer of $412,000 for the apartment complex, the construction of which was 75 to 80 percent completed at the time. The offer to purchase was made by Clarence McFadden, a resident of Sun City, California. It was communicated to Mansfield by the prospective buyer's son Neil McFadden, a Madison resident. This offer was reduced to writing by Mansfield on the following day; however, Smith rejected the offer as too low and refused to sign the document. Mansfield was not able to persuade McFadden to raise the offering price.

---

[1] The offer to purchase eventually signed by Smith as seller and Clarence McFadden as buyer also contained a default provision which declared:

"Should the undersigned Buyer fail to carry out this agreement, all money paid hereunder shall, at the option of the Seller, be forfeited as liquidated damages and shall be paid to or retained by the Seller, subject to deductions of Broker's commission and disbursements, if any."

On December 17, 1973, Smith asked Mansfield to contact McFadden in California. Smith stated he would accept the original offer of $412,000 if Mansfield agreed to a reduction of his broker's commission to a flat $15,-000. Mansfield agreed and later set forth the commission modification in a writing signed by the parties on December 26, 1973.

Mansfield telephoned McFadden on the evening of December 17, 1973. McFadden agreed to reinstate the offer and, as Mansfield later testified, told the broker to write up the offer and send it to him.[2] McFadden stated if everything was satisfactory he would sign the offer and return it along with an earnest money check. The new document was drafted. On December 18, 1973, it was signed by Smith as seller and Mansfield as broker, and sent on to McFadden in California as the buyer. The seller signed the agreement before the buyer McFadden, contrary to usual practice, because the time for closing which was to be before December 31, 1973 was short. The offer to purchase was duly signed by Clarence McFadden and his wife. It was then returned to Mansfield, together with an earnest money check for $1,000, in an envelope postmarked December 21, 1973, Sun City, California. Under the terms of the agreement signed, the property was to be sold for a price of $412,000. This agreement included the additional special condition that —"Seller shall at his expense lease 20 apartments for purchaser."

On December 24, 1973, several incidents occurred, the exact sequence of which was never fully resolved. Sometime during the morning Mansfield received the offer to purchase and earnest money check sent to him by the McFaddens. Also sometime during the morning Clarence McFadden stopped payment on his earnest money check

---

[2] McFadden died in 1976 prior to the hearing on the matter. No objection was made to the testimony concerning the statements he allegedly made during the negotiations.

and telegraphed Smith and Mansfield not to proceed with the closing. Mansfield received a telephone call from Western Union advising him of the telegram. Although the sender had requested that the telegram be delivered to the broker personally, it was read to Mansfield over the telephone. The message was as follows:

"Stop closing sale of apartment at 1911 Pike Road, Madison, Wisconsin. Not going to but."

Mansfield told the Western Union operator he did not understand the telegram and requested clarification. Western Union business records put in evidence at the trial indicated that McFadden was notified that clarification had been requested, but never responded. No clarification of the message was received by Western Union and the telegram was never delivered. In a deposition taken shortly before his death and admitted into evidence pursuant to stipulation, McFadden denied cancelling the telegram and gave the following explanation for his failure to correct the text:

"I didn't do nothing about it because I thought he didn't want to understand it. . . If they put another line on that last word there, it would say "buy," and he didn't want to understand it."

On December 24, 1973, Mansfield was also contacted by Neil McFadden who instructed the broker to telephone Clarence McFadden, which he did. In their telephone conversation McFadden explained that he was concerned that there would not be enough income to cover expenses and mortgage payments if 20 units were not rented by the seller as per the terms of the agreement. Mansfield informed McFadden that the agreement contemplated Smith's paying any cash deficiency if he failed to rent all 20 units. According to Mansfield's testimony, this reassured McFadden. He agreed to reinstate the earnest money check and cancel the telegram. A letter making explicit the fact that the seller Smith in signing the

agreement undertook to guarantee the rental payments of 20 units was drafted by Mansfield. This addendum to the offer to purchase was signed by Smith and, pursuant to Clarence McFadden's instructions, delivered to Neil McFadden.

A few days later Mansfield was contacted by and met with Attorney Trayton Lathrop of Madison, Wisconsin, who stated he was representing Clarence McFadden in the matter of the sale of the property. On January 4, 1974, Attorney Lathrop sent a letter to both Mansfield and Smith confirming the fact that McFadden no longer intended to purchase the property and advising them that the McFaddens did not consider that any binding contract had been entered into.

On January 25, 1974, Mansfield sent Smith a statement in the amount of $15,000 for services rendered as per the listing contract. Mansfield received a reply, dated January 28, 1974, from Smith's attorney John Harrington. The letter suggested that Mansfield attempt to renegotiate a deal with McFadden at a sale price of $405,000. The letter also indicated that Smith, like McFadden, thought there was no binding contract of sale in existence.

In February, 1974, Mansfield commenced this action against Smith for the collection of the $15,000 broker's commission allegedly due him under the listing contract. Summons and complaint were filed in the circuit court for Dane county on March 20, 1974. Defendant Smith in an answer dated March 16, 1974, denied that an enforceable contract of sale had been created and further denied that the broker had procured a ready and willing purchaser for the property.

In 1976, several months prior to trial, the defendant moved for leave to amend the answer in order to assert as an affirmative defense the seller's election right under the liquidated damages clause in the listing contract. On

stipulation of the parties, this permission was granted by the court in an order dated February 9, 1976. Also on stipulation and pursuant to an order of the court, leave to file an amended complaint was similarly given the plaintiff. The defendant Smith's amended answer, dated January 30, 1976, affirmatively alleged that Smith as seller had elected to take as liquidated damages the money paid by the buyer and that under the terms of the listing agreement the broker's commission was therefore limited to one-half the balance of the earnest money after deduction of the broker's actual disbursements. This would amount to nothing at all in the present case in view of the fact that the earnest money check was returned to the broker unpaid because buyer McFadden stopped payment on it. In an amended complaint dated May 25, 1976, the broker disputed Smith's right to rely on the contract's liquidated damages provision and asserted that Smith was either estopped, was guilty of laches or had waived his right to raise the defense by reason of his failure to exercise his option within a reasonable period of time. The defendant's answer to the amended complaint was dated June 11, 1976, and filed on November 5, 1976.

Trial was held to the court on June 14, 1976. A memorandum decision containing trial court's findings of fact and conclusions of law was filed on November 5, 1976. The court's principal findings with respect to the issues in this appeal were as follows: that a contract of sale existed between buyer McFadden and seller Smith; that the letter of December 24, 1973 guaranteeing the rental of 20 units was simply a clarification of the contract; that the contract was not affected by the telegram incident; that Mansfield procured a purchaser for the property; and that Smith failed to exercise his option to declare the earnest money as liquidated damages within a reasonable time. On the basis of these and other findings the court concluded that the broker was entitled to his

$15,000 broker's commission under the terms of the listing contract. On November 8, 1976, judgment was entered in favor of the plaintiff in the amount of $15,000 plus $3,210.77 for interest, costs and disbursements. Smith appeals from the whole of the judgment which was stayed pending appeal upon proper undertaking pursuant to statute.

In this appeal two separate issues must be considered. The first is whether Mansfield procured a purchaser for the property. The second issue is whether, assuming a purchaser was in fact procured by Mansfield, the amount due him as a broker's commission is limited to the contract's liquidated damages clause. The trial court's analysis with respect to this second issue centered on whether the seller lost, waived or was estopped from asserting his right to invoke the seller's option under the liquidated damages provision for failing to make an election within a reasonable period of time.

The real estate listing contract executed by Mansfield and Smith provided that the broker was to "procure a purchaser" for the 24-unit rental property owned by the building contractor. The trial court found that the broker did procure a purchaser. This finding will not be set aside on appeal unless it is contrary to the great weight and clear preponderance of the evidence or unless, although labeled a finding, it is essentially an erroneous conclusion of law.[3]

This court follows the rule that:

"A broker employed to 'procure a purchase' for real estate is entitled to his commission when he produces a

---

[3] *Boutelle v. Chrislaw,* 34 Wis.2d 665, 672–73 (1967); *Pederson v. First Nat. Bank,* 31 Wis.2d 648, 654, 143 N.W.2d 425 (1966); *Vogt, Inc., v. International Brotherhood,* 270 Wis. 315, 321i, 71 N.W.2d 359, 74 N.W.2d 749 (1955); *Kirchen v. Gottschalk,* 26 Wis.2d 123, 126, 131 N.W.2d 885 (1965).

person ready, willing, and able to purchase upon the terms specified by the owner in the brokerage contract." *Niske v. Nackman*, 273 Wis. 69, 75, 76 N.W.2d 591 (1956). *See also, Peter M. Chalik & Associates v. Hermes*, 56 Wis.2d 151, 157, 201 N.W.2d 514 (1972).

Under certain circumstances it is necessary to make a specific, separate analysis of the readiness, willingness and financial ability of the customer found by the broker.[4] This procedure is unnecessary, however, in cases where the court finds that the buyer and seller entered into a valid and binding contract of sale. This alternative method of proving that the broker fulfilled his obligation to procure a purchaser was recognized by this court in *Kruger v. Wesner*, 274 Wis. 40, 44, 79 N.W.2d 354 (1956), where it was stated:

"The courts are practically unanimous in holding that a broker employed to sell or exchange lands earns his commission, unless the contract of employment contains a stipulation to the contrary, when a customer and the employer enter into a valid and binding contract for the sale or the exchange of lands."

The court, in adopting this rule, cited the following pertinent observation of the court in *Oregon Home Builders v. Montgomery Inv. Co.*, 94 Or. 349, 363, 184 P. 487 (1919):

"If the employer [enters into a binding contract with the customer/buyer], he in effect says to the broker:
" 'I accept the customer as a person ready, able and willing to purchase or exchange lands, as the case may be; you have done what you agreed to do; I have accepted the services rendered by you; and you have earned your commission.'
"The employer has a reasonable opportunity to investigate the ability of the customer to perform and when, without fraud or misrepresentation on the part of the broker, the employer accepts the customer by effecting a valid and binding contract with him, it is equivalent

---

[4] *See Boutelle v. Chrislaw, supra,* 34 Wis.2d at 675.

to a determination that the customer is a person ready, able and willing to purchase or exchange and the employer is estopped thereafter to deny the ability or willingness of the customer to complete the contract."

This rule applies even though the purchaser later fails to carry out the agreement and defaults. *Winston v. Minkin,* 63 Wis.2d 46, 51, 216 N.W.2d 38 (1974).

In this case it is undisputed that on December 18, 1973, the seller signed the document entitled "Offer to Purchase" and forwarded it through Mansfield to the California buyer. It is also undisputed that the buyer Clarence McFadden and his wife signed the agreement and returned it to the broker together with an earnest money check for $1,000 in an envelope postmarked December 21, 1973. Based upon this evidence the trial court found that defendant-seller Smith offered to sell and McFadden agreed to buy the rental property in question, and that a valid and enforceable contract of sale was thereby created. The defendant/seller challenges the trial court's determination on two grounds: first, these acts were insufficient to bind the parties; second, the existence of an effective acceptance was negated both by the buyer's telegram message to stop the closing and by the addendum to the contract amplifying the seller's obligation to guarantee the rental payments. With respect to the legal effect of these two items, the defendant contends that the telegram was an explicit rejection of the offer which arrived before the acceptance was communicated to him and had the effect of cancelling the acceptance. He also argues that the addendum to the offer should be viewed as an attempted acceptance which included a substantial variation in a material term and which therefore amounted to a rejection of the offer and the submission of a counter offer.[5]

---

[5] *See Hess v. Holt Lumber Co.,* 175 Wis. 451, 455, 185 N.W. 522 (1921).

Mailing is sufficient to satisfy the legal requirements imposed in the day-to-day conduct of business. *E. M. Boerke, Inc. v. Williams,* 28 Wis.2d 627, 635, 137 N.W. 2d 489 (1965). This court follows the general rule concerning mailing as an effective mode of acceptance, *id.* at 635.

". . . the acceptance of an offer is binding from the moment an offeree deposits a properly addressed letter of acceptance in the mailbox, but only if there is an express or implied authorization that the mails are to be used. Such an implied authorization would arise when the offer is communicated by mail." *See also,* 17 C.J.S. *Contracts,* p. 719, sec. 52b; 17 Am. Jur.2d, *Contracts,* p. 387, sec. 48, p. 389, sec. 49; 1 Corbin, *Contracts,* p. 333, sec. 78; and *Hess v. Holt Lumber Co., supra,* 175 Wis. at 453.

In the present case, the offer having been made by mail, the acceptance could also be made by mail. Thus, the contract of sale was complete from December 21, 1973, when it was mailed by McFadden to Mansfield. The subsequent conduct of the buyer had no effect on the completed contract.[6] The evidence concerning the telegraph message and the addendum to the contract—both of which came after the mailing of the acceptance—is immaterial. The findings of the trial court that a valid contract of sale had been entered into between McFadden and Smith and that the broker had consequently procured a purchaser for the property are not contrary to the great weight and clear preponderance of the evidence.

A valid contract of sale having been created between buyer and seller in this case, under the general rule plaintiff Mansfield is entitled to his $15,000 broker's commission unless the real estate listing contract "contains a

---

[6] 17 Am. Jur. 2d, *Contracts,* pp. 379–80, sec. 41.

stipulation to the contrary." *Kruger v. Wesner, supra,* 274 Wis. at 44; *see also Dean v. Wendeberg,* 175 Wis. 513, 515, 185 N.W. 514 (1921). Seller Smith argues that the liquidated damages clause in the contract is such a stipulation and that its provisions determine the amount of commission the broker is entitled to receive under the circumstances.

The liquidated damages clause by its terms applies, "If buyer of said property should fail to carry out his agreement, and SELLER elects to take as liquidated damages all money paid by buyer. . . ." In such a situation the money paid by the buyer "shall be applied first to reimburse BROKER for cash advances made by him and one half of the balance, but not in excess of the agreed commission shall be paid to the BROKER as his full commission. . . ." In view of the fact that the buyer's $1,000 earnest money check was returned unpaid, application of the liquidated damages provision in this case means that the broker will receive no payment for the services he rendered. The broker does not protest the equity of such a result as a general matter; however, it is his position that under the circumstances of present case the seller has lost, waived or is estopped from invoking his option by his failure to exercise his right to elect in a timely manner.

The liquidated damages clause essentially contains two preconditions, *i.e.,* that the buyer default on his agreement and that the seller thereafter elect to take the money paid by the buyer as liquidated damages. Upon default by the buyer, the seller has the option therefore either to affirm the contract, such as bringing an action against the buyer for specific performance, or to recognize the breach and treat the money received from the buyer as liquidated damages. In the former situation if the seller is successful the broker receives the full commission originally agreed upon. In the latter situation

the broker is limited to the amount provided in the liquidated damages clause, *i.e.,* one-half the balance of the money paid after deduction of the actual disbursements.

We must here consider when and how the seller must exercise his right of election under the listing contract. We must further consider whether under the circumstances of the present case the seller should be held to have waived or to have lost by his laches or to be estopped from asserting his option.

The term "election" as used in a legal and commercial context is not a term of art. It is construed by the court in a practical rather than a technical manner. The general approach is summarized in 5 Williston, *Contracts* (3d ed.), pp. 269–275, sec. 683:

"§683. **Election.** Election as a term in the law is properly applied to a case where a person has the choice of one of two alternative and inconsistent rights or remedies. . . .

". . . In some cases involving election, the party having this right of choice may take no action for an indefinite period. Only exigencies of fact rather than any rule of law compel him to act. For instance, an infant who has entered an executory contract presumably may, without losing his right to avoid the contract, wait until after he comes of age or until the time when performance is due from him or from his co-contractor. That time may come early or late, and only when it does is some action necessary.

"In other cases, the failure to act promptly deprives the party having the right of election of any choice. Thus, though one who has been induced to enter into a contract by fraud may elect after discovering the fraud to avoid the contract, prompt action is in some cases at least essential; the mere lapse of time may destroy the election. The same is true of rescission for breach of contract. . . .

"Election to take advantage of breach of condition in a contract generally need not be exercised until the time arrives when, by the terms of the contract, the party

entitled to elect must render some performance. Then either performing or failing to perform will indicate an election. Even prior to that time, however, any conduct which under the circumstances is deceptive except on the assumption that a choice has been made, may amount to an election."

This court has never required formal notice of intent to elect under the provisions of a liquidated damages clause in the absence of an express agreement to the contrary. In *Moritz v. Broadfoot*, 35 Wis.2d 343, 151 N.W.2d 142 (1967), a case which involved a similar provision contained in a contract of sale between buyer and seller, the court rejected the buyer's claim that the seller's unexplained retention of a $1,000 earnest money check was an implicit acceptance of liquidated damages and an exercise of the right of election which barred the seller from bringing a suit for specific performance. The court concluded that merely retaining the money paid by the buyer did not indicate an election on the seller's part. No inconsistency was seen in the retention of the earnest money check and the commencement of the action to enforce the contract, the check being considered part payment of the purchase price rather than liquidated damages for breach of contract. The court distinguished *Zimmermann v. Thompson*, 16 Wis.2d 74, 114 N.W.2d 116 (1962), a case relied on by the plaintiff-broker in the present action. In *Zimmermann* the seller's retention of the money was held to be an election; however, as the court noted in *Moritz*, *Zimmermann* only applies to the situation where the seller stands on the liquidated damages clause to get his damages without inconvenience and later attempts to bring an action under the contract. *Moritz* at 249. More recently, this court in *Sorce v. Rinehart*, 69 Wis.2d 631, 639, 230 N.W.2d 645 (1975), reversed a trial court judgment which had concluded that

a seller was estopped from suing the buyer for specific performance of the contract of sale because he failed to specifically disavow any intention to treat as liquidated damages the earnest money he had retained. The summons and complaint served in the action to enforce the contract was held to constitute timely and effective notice of the seller's election to stand on his contractual rights rather than on the provisions of the liquidated damages clause.

The seller's actions in this case must be viewed in a similarly practical light. In January, 1973, as soon as it became apparent that McFadden did not intend to purchase the property, Smith made it clear to the broker that he did not think an enforceable agreement had been created. Indeed, Smith through his attorney suggested that Mansfield attempt to reinstate negotiations with McFadden with a view to procuring a binding agreement at a new sales price of $405,000. However, it was not until January, 1976, in an amended answer filed by leave of the court that Smith explicitly declared that in the event it was found that a valid agreement had been created he as seller elected to take as liquidated damages the money paid by the buyer before his default.

Despite the flexible approach to the seller's option under the liquidated damages clause evinced in *Moritz v. Broadfoot, supra,* 35 Wis.2d 343 and *Sorce v. Rinehart, supra,* 69 Wis.2d 631, plaintiff Mansfield asserts that the doctrines of waiver, estoppel and laches prevent Smith from invoking the provisions of the liquidated clause as a defense in this action to collect his broker's commission.

" 'Waiver' is defined as voluntary and intentional relinquishment of a known right. As said in *Nolop v. Spettel* (1954), 267 Wis. 245, 249, 64 N.W. (2d) 859:

" ' "A waiver is the intentional relinquishment of a known right." *Swedish American Nat. Bank v. Koebernick,* 136 Wis. 473, 479, 117 N.W. 1020. "Since an inten-

tion to relinquish an existing right or advantage is generally regarded as an essential of a waiver, it follows that it must be shown by the party claiming a waiver that the person against whom the waiver is asserted had at the time knowledge, actual or constructive, of the existence of his rights or of the facts upon which they depended. Ignorance of a material fact negatives a waiver. Waiver cannot be established by a consent given under a mistake of fact." 56 Am. Jur., Waiver, p. 114, sec. 14.' " *Davies v. J. D. Wilson Co.*, 1 Wis.2d 443, 466, 467, 85 N.W.2d 459 (1957).

There is nothing in the record to indicate that Smith intentionally relinquished his right of election. Indeed, Smith consistently maintained—and explicitly so informed the broker—that it was his position that a condition precedent for the activation of the liquidated damages provision, namely, that the buyer default on an agreement, was missing. The doctrine of waiver is not available to the broker on these facts.

The plaintiff argues that if Smith did not waive his option he was guilty of laches in failing to exercise it in a timely fashion and is thereby estopped from relying on it as an affirmative defense. This was the position taken by the trial court.

" ' ". . . An estoppel *in pais* consists of action or nonaction on the part of the one against whom the estoppel is asserted which induces reliance thereon by another, either in the form of action or nonaction, to his detriment. *Dixon v. Davidson* (1930), 202 Wis. 19, 231 N.W. 276; *Callaway v. Evanson* (1956), 272 Wis. 251, 75 N.W. (2d) 456; *Eau Claire Dells Improvement Co. v. Eau Claire, supra*." '

"The equitable doctrine of laches is a recognition that a party ought not to be heard when he has not asserted his right for unreasonable length of time or that he was lacking in diligence in discovering and asserting his right in such a manner so as to place the other party at a dis-

advantage." *Bade v. Badger Mut. Ins. Co.,* 31 Wis.2d 38, 46, 47, 142 N.W.2d 218 (1966).

In the present case the seller apparently took the position that any election, either recognizing the breach of contract by retaining as liquidated damages the money paid by the buyer or standing in his contractual rights by bringing a suit to enforce the contract, was premature under the circumstances as he understood them to be, *i.e.,* absent a binding agreement between himself and McFadden. That Smith believed no contract had been created is borne out by the fact that he did not commence an action against McFadden to enforce the agreement. The position taken by Smith is not inconsistent with an intent to stand on the liquidated damages clause should it be found that an enforceable contract had been entered into. Neither the actions nor the nonactions of the seller provide an adequate ground for the application of the doctrine of estoppel. Furthermore, estoppel is inappropriate where, as in the present case, there is no showing that the party claiming the benefit of the doctrine took any action, or refrained from any action, or incurred any expense to his detriment in reasonable reliance on the belief that the other party would not assert the affirmative defense. Finally, as a practical manner, since the $1,000 earnest money check was returned unpaid in the present case, for the seller to have specifically informed the broker that he should retain his share of the earnest money as his full commission would have been an empty gesture.

Significantly, in construing the listing agreement we must apply the following rule:

"The listing agreement having been a printed form supplied by the plaintiff broker, the same must be most strongly construed against the broker in case of any

ambiguity or doubt. 12 Am. Jur., Contracts, p. 795, sec. 252; 17 C.J.S., Contracts, p. 751, sec. 324." *Dunn & Stringer Investment Co. v. Krauss,* 264 Wis. 615, 619, 60 N.W.2d 346 (1953). See also *Nordale Realty Co. v. Hanel,* 251 Wis. 136, 141, 28 N.W.2d 245 (1947); *E. M. Boerke, Inc. v. Williams,* 28 Wis.2d 627, 634, 137 N.W.2d 489 (1965).

Furthermore, if the broker wished to receive express notice of the seller's intent to elect within a certain period of time he could have included an express provision to that effect.

The trial court found that the seller did not exercise his right of election within a reasonable time. We believe this determination was based on an erroneous legal assumption concerning the nature of the responsibility of a seller who has a right of election under the provisions of a liquidated damages clause.

*By the Court.*—Judgment reversed with directions to dismiss the amended complaint.