FIRST WEBER GROUP NORTHERN WISCONSIN, LLC,
Plaintiff-Appellant,

v.

Joseph GUYANT and Lisa Dotter Guyant,
Defendants-Respondents.

Court of Appeals

*No. 2010AP1140. Submitted on Briefs December 16, 2010.
—Decided May 26, 2011.*

2011 WI App 84

(Also reported in 800 N.W.2d 494.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Kim Moermond* of *First Weber Group, Inc.*, Madison.

On behalf of the defendants-respondents, the cause was submitted on the brief of *J.P. La Chapelle of Brazeau, Wefel, Kryshak & Nettesheim, LLP*, Wisconsin Rapids.

A nonparty brief was filed by *Debra Peterson Conrad* for the Wisconsin Realtors Association.

Before Vergeront, P.J., Higginbotham and Sherman, JJ.[1]

¶ 1. VERGERONT, P.J. This appeal concerns a dispute under a residential listing contract between the sellers of residential real estate and a real estate brokerage firm, First Weber Group Northern Wisconsin, LLC. After the expiration of the term of the contract, the sellers sold the property to a buyer with whom they had had contact during the contract's term. The dispositive issue on appeal is whether First Weber is entitled to a commission on that sale because the buyer was a "Protected Buyer" under the contract. The circuit court resolved this issue against First Weber, and First Weber appeals.

¶ 2. We conclude the buyer was a "Protected Buyer" under the contract and First Weber is therefore entitled to the commission. Accordingly, we reverse the

---

[1] This case was converted from a one-judge appeal to a three-judge appeal pursuant to Wis. Stat. § 809.41(3) (2009–10). All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

order dismissing the action and remand with directions to enter judgment against the Guyants for the commission due First Weber under the listing contract.

## BACKGROUND

¶ 3.  Joseph Guyant and Lisa Dotter-Guyant (collectively, the Guyants) signed a WB-1 Residential Listing Contract-Exclusive Right to Sell with First Weber.[2] The contract gives First Weber the exclusive right to sell the Guyants' home. The list price was $79,900 and the agreed upon commission was 6.5%, with the term of the contract from July 2, 2008, through January 31, 2009. Judy Whitrock was the First Weber agent working with the Guyants to sell their home. Whitrock was also working with the Guyants in their efforts to purchase a new home in the area.

¶ 4.  On January 9, 2009, three weeks before the expiration of the contract, a woman, later identified as Michele Bushman, stopped by the Guyant home and spoke with Joseph about the property. She had found the listing of the property online after driving past the house on an earlier occasion. Bushman asked if the Guyants would be willing to sell without a realtor. Joseph said he didn't know and he would have to talk to his wife. In response to her question on when the contract with the realtor would expire, Joseph told Bushman it was sometime in January. Bushman left her phone number with Joseph, saying to contact her if they were interested.

¶ 5.  Lisa called Bushman that same evening. She told Bushman that if Bushman wished to see the house,

---

[2] The WB-1 Residential Listing Contract-Exclusive Right to Sell form was approved by the Wisconsin Department of Regulation and Licensing for optional use on January 1, 2008, and for mandatory use on July 1, 2008.

she would need to go through First Weber. Bushman insisted that she refused to work with a realtor. Lisa told Bushman that she would call Bushman after the listing contract expired to see if she wanted to view the house then.

¶ 6.  Lisa sent an email to Whitrock on January 12 informing her that a woman stopped by and asked about the property but refused to go through a realtor. Lisa wanted to know whether, if the woman was interested in buying their home after the listing contract expired, Whitrock could assist them and, if so, how the fee would be determined. In the subsequent two weeks, there were emails between Lisa and Whitrock and a meeting during which Whitrock and Lisa discussed Bushman. Whitrock wanted either to contact Bushman herself or have Lisa do so. Lisa did not want either Whitrock or herself to contact Bushman before the expiration of the listing contract. In an attempt to resolve the issue, Whitrock proposed to reduce the commission to 3.5% for any sale to Bushman. She also proposed that the Guyants extend the listing contract with Bushman listed as an exception (meaning First Weber would not receive a commission for a sale to her) and that the Guyants enter into a buyers' agent agreement with First Weber for the purchase of a new house. The Guyants rejected these proposals and the parties did not reach a resolution. The listing contract expired on January 31, 2009, without either Lisa or Whitrock having any further contact with Bushman.

¶ 7.  On February 2, 2009, Lisa called Bushman and arranged for Bushman to view the Guyants' property the next day. In March, the Guyants signed a new listing contract with Century 21 Professionals, LLC, in which Bushman was identified as an "exception" for two weeks. This meant that, if Bushman made an offer to

purchase the Guyants' home and the Guyants accepted within that time, the Guyants would not need to pay a commission to Century 21. During that two weeks, Bushman made an offer to purchase the Guyants' home for $68,000 and the Guyants accepted it. The sale closed in April 2009.

¶ 8. First Weber filed this lawsuit alleging that it was entitled under the listing contract to a commission of $4,420, or 6.5% of $68,000. At trial it presented three alternative legal theories in support of its right to recovery. First, First Weber argued that Bushman was a "Protected Buyer" as defined in the contract and therefore the term of the contract was extended as to Bushman for one year. Second, First Weber alleged that Lisa's conduct violated the cooperation requirements in the contract. Third, First Weber alleged her conduct violated the duty of good faith implied in every contract.

¶ 9. The circuit court determined that Bushman was not a "Protected Buyer" because the Guyants had not "negotiated" with Bushman as defined in the contract. The court also determined that Lisa did not violate the contract cooperation requirements and did not breach the duty of good faith implied in every contract.

## DISCUSSION

¶ 10. On appeal First Weber contends that the circuit court erred because the undisputed facts show it was entitled to recover from the Guyants on each of its three legal theories.[3] Because we conclude that the circuit court erred in determining that Bushman was not a "Protected Buyer" under the contract, we do not

---

[3] Wisconsin Realtors Association filed an amicus curiae brief on appeal.

address First Weber's contention that the court also erred in determining that the Guyants did not violate the contract cooperation requirements and the implied duty of good faith.

¶ 11. The facts material to the "Protected Buyer" issue are not disputed. Whether the circuit court properly construed the contract language and applied it to the undisputed facts presents a question of law, and our review is therefore de novo. *See Galatowitsch v. Wanat*, 2000 WI App 236, ¶ 11, 239 Wis. 2d 558, 620 N.W.2d 618.

¶ 12. The listing contract signed by the Guyants specifies several situations in which the broker earns the commission. One is when the seller sells the property during the term of the listing. The term of the listing is "extended for a period of one year as to any Protected Buyer." The definition of "Protected Buyer" potentially applicable here is "a buyer who personally, or through any person acting for such buyer . . . negotiates directly with Seller by discussing with Seller the potential terms upon which buyer might acquire an interest in the Property . . . ."[4]

---

[4] The definition of "Protected Buyer" is divided into three categories:

> PROTECTED BUYER: Means a buyer who personally, or through any person acting for such buyer: 1) delivers to Seller or Broker a written offer to purchase, exchange or option on the Property during the term of this Listing; 2) negotiates directly with Seller by discussing with Seller the potential terms upon which buyer might acquire an interest in the Property; or 3) attends an individual showing of the Property or discusses with Broker or cooperating brokers the potential terms upon which buyer might acquire an interest in the Property, but only if Broker delivers the buyer's name to Seller, in writing, no later than three days after the expiration of the Listing . . . .

¶ 13.  Thus, the question presented is whether Bushman "negotiated" with the Guyants as defined in this provision—that is, "by discussing with [the Guyants] the potential terms upon which [she] might acquire an interest in [their] Property." If Bushman did, then she was a "Protected Buyer" and First Weber is entitled to a 6.5% commission on the price she paid the Guyants for their home because the sale took place within the one-year extension. If Bushman did not, then First Weber is not entitled to a commission because the sale took place after the expiration of the original listing term.

¶ 14.  There are two cases that have applied this same definition of "negotiate":  *Sonday v. Dave Kohel Agency, Inc.*, 2006 WI 92, 293 Wis. 2d 458, 718 N.W.2d 631, and *Burkett & Assoc., Inc. Century 21 v. Teymer*, 2009 WI App 67, 318 Wis. 2d 525, 767 N.W.2d 623. Each party finds support for its position in both cases. In the following paragraphs we describe these cases in some detail and then discuss the parties' arguments based on them. While these two cases provide guidance and some answers, they do not resolve the issue presented by the facts of this case. Ultimately we conclude that the plain meaning of "discussing with Seller the potential terms upon which buyer might acquire an interest in the Property" applies to the interaction between Bushman and the Guyants that took place before January 31, 2009.

¶ 15.  Both *Sonday* and *Burkett* concerned the issue whether the buyer's interaction with the broker constituted "negotiation," which was defined, as in this contract, to mean "discuss[ing] [or discussion of] the potential terms upon which buyer might acquire an interest in the Property." *Sonday*, 293 Wis. 2d 458, ¶ 29; *Burkett*, 318 Wis. 2d 525, ¶ 10. Under the listing

contracts in *Sonday* and *Burkett,* as under the listing contract here, such a discussion between the buyer and the broker was an alternative means of establishing a "Protected Buyer." *See* footnote 4.

¶ 16. In *Sonday* the court concluded that the conversation between the broker and the buyer was a "discuss[ion] [of the] potential terms upon which the buyer might acquire an interest in the Property." *Sonday,* 293 Wis. 2d 458, ¶ 34. The court reached this conclusion based on these facts: the broker initiated contact with the buyer and suggested that the buyer purchase the property for approximately two million dollars and the buyer refused this offer. *Id.*

¶ 17. In *Burkett* the court similarly concluded that the interaction between the broker and buyer met this standard. *Burkett,* 318 Wis. 2d 525, ¶ 13. The facts that constituted a negotiation were as follows. The broker's assistant contacted an employee of the potential buyer—a company—and provided information about the seller's property, including the price. *Id.* The company's employee referred the broker's assistant to the company's owner, who asked the broker's assistant to fax him information on the property. *Id.* The broker's assistant faxed the owner all the information he needed to acquire the property. *Id.*

¶ 18. We reasoned in *Burkett* that the "exchange of information between [the company's employee] and [the broker's assistant] and then [the company's owner] and [the broker's assistant] constitutes a negotiation: discussion of 'the potential terms upon which [the company] might acquire an interest in the . . . Property.' " *Id.* We clarified that a broker does not negotiate "by unilaterally sending information to other parties." *Id.,* ¶ 14. Rather, it was the "two-way communication" —the company expressing an interest in the property

and asking for information and the broker providing it—that fulfilled the contract's definition of "negotiate." *Id.*

¶ 19.  First Weber asserts that the following four sets of facts are sufficient under *Sonday* and *Burkett* to constitute a negotiation between Bushman and the Guyants within the contract definition: (1) The online listing of the Guyants' property on First Weber's website, which Bushman saw, included the listing price and important features of the property; (2) Bushman came to the Guyants' property because of First Weber's marketing efforts in that she noticed First Weber's yard sign and then accessed its website; (3) Bushman expressed an interest in the property to the Guyants; and (4) the Guyants learned from Bushman where she lived and that she was seeking a house that she and her husband would purchase and then rent to her mother and brother. In First Weber's view, the additional facts concerning the Guyants' discussion with Bushman about selling without a broker strengthen its position that negotiation occurred, but these additional facts are not necessary to reach that conclusion.

¶ 20.  The Guyants respond that under *Burkett* First Weber's website listing does not constitute negotiation. As for the discussion of whether the sale would involve a broker as agent for the seller, the Guyants assert that this does not constitute negotiation because *Sonday* and *Burkett* require discussion of a purchase price. In addition, the Guyants consider it significant that in *Burkett* the company owner, after learning that the property was listed with the broker's firm, had contacted the property owners, whom he had already met, to ask if he could contact the broker directly. *Burkett*, 318 Wis. 2d 525, ¶ 5. The Guyants contrast this with the facts in this case—that Bushman was

insistent that she did not want to deal with a broker acting on behalf of the seller. Finally, the Guyants contend that we must construe this contract provision strictly, against the broker, and they rely on *Sonday*, 293 Wis. 2d 458, ¶ 31.

¶ 21. We conclude that the first four sets of facts on which First Weber relies do not together constitute a negotiation between the Guyants and Bushman within the meaning of the listing contract. While the information Bushman obtained from First Weber's online listing included potential terms on which a sale might occur, this information was not provided by the Guyants in response to a request by Bushman. In addition, there is no evidence that any particular term from the online information was discussed between Bushman and the Guyants. We agree with the Guyants that, in the absence of such evidence, the online information remains the type of "unilaterally [provided] information" that we said in *Burkett* does not constitute the "two-way communication" necessary to constitute "discussion of 'the potential terms upon which [Bushman] might acquire an interest in the [Guyants'] Property.' " *Burkett*, 318 Wis. 2d 525, ¶¶ 13–14. We do not see how the fact that First Weber created the website and installed the yard sign as part of its marketing efforts alters this analysis, and First Weber does not provide an explanation. As for Bushman's expression of interest in the property and her disclosure of why she wanted to purchase a house, these are plainly not "potential terms" on which Bushman "might acquire" the Guyants' home.

¶ 22. However, we reach a different result on the discussion between Bushman and the Guyants regarding Bushman's desire not to have to deal with the Guyants' broker in order to purchase their home. This

discussion began with Bushman coming to the Guyants' home after obtaining the information from the online listing and asking Joseph if the Guyants would be willing to sell without a realtor and also asking him when the contract with the realtor would expire. Joseph told her his understanding of the expiration date and told her he would have to talk to his wife about selling without a realtor. Lisa was interested in pursuing a discussion with Bushman and called the phone number Bushman had left. According to Lisa's testimony, Bushman wanted to do a "sale by owner" and she told Bushman that she and her husband had no interest in that. They had a realtor, Lisa said, and if Bushman wanted to see the house, Whitrock could show her or she could "go through a different one." Bushman was insistent on not working with a realtor. The conversation ended with Lisa telling Bushman that she would call Bushman after the listing contract expired to see if Bushman wanted to view the house then.

¶ 23.   Clearly a discussion in the sense of a "two-way communication," *see Burkett,* 318 Wis. 2d 525, ¶ 14, took place between the Guyants and Bushman on the question whether Bushman would pursue her interest in the house with the Guyants only or with a broker acting as the Guyants' agent. The question is whether this discussion was on "the potential terms upon which [Bushman] might acquire an interest in the [Guyants' home]." When we examine the contract language at issue—"discussing with Seller the potential terms upon which buyer might acquire an interest in the Property"—we see no suggestion that the "potential terms" are limited in any way except that they must be ones "upon which buyer might acquire an interest in the Property." Bushman's willingness to purchase the Guyants' property only if the Guyants dealt directly

with her without a broker is plainly a potential term upon which she might purchase the property.

¶ 24.  As noted above, the Guyants present three arguments in support of their position that the discussion does not meet this standard. We do not find these arguments persuasive.

¶ 25.  First, the Guyants point out that price was not discussed. While it is true that in both *Sonday* and *Burkett* the broker or the broker's assistant conveyed the price of the property to the buyer, we do not read either case to require a discussion of the price in order to constitute a negotiation within the meaning of the listing contract. That may be the term most often discussed, but we see nothing in either case or in the contract language that requires a discussion of that particular "potential term."

¶ 26.  Although we conclude that discussion of price is not a requirement for a negotiation between the seller and the buyer within the meaning of the listing contract, we observe that the issue whether a broker acts as agent for the seller in the sale of the property does potentially affect the price. Without the seller having to pay a commission to the broker for the broker's services, the price to the buyer can be reduced by that amount and the seller will end up with the same amount from the sale proceeds. That is essentially what happened in this case.[5]

¶ 27.  Second, the Guyants' rely on the factual distinction that in *Burkett* the buyer asked for permission from the property owner to contact the broker

---

[5] The price of the Guyants' home under Century 21's listing contract was $75,000. Bushman purchased the home for $68,000 and the Guyants did not have to pay a commission because Bushman was listed as an exclusion under that contract.

directly and in this case Bushman did not want to deal with the Guyants' broker. The Guyants do not explain the significance of this factual distinction and we see none. As we have already noted, the "Protected Buyer" standard at issue in *Burkett* concerned the contact between the broker and the buyer, and we based our conclusion on that contact. The buyer's call to the property owner was part of the factual background we set forth in our *Burkett* opinion, but it was not germane to the definition of "negotiate" and it was not included in the facts we considered in deciding there had been negotiation between the broker and the buyer. *See Burkett*, 318 Wis. 2d 525, ¶¶ 5, 13–14. Nor is the seller's permission for the buyer to contact the broker germane to the same definition of "negotiate" applied in this case.

¶ 28.   Third is the Guyants' argument that we must construe the contract language strictly against the broker. The Guyants rely on this statement in *Sonday*:

> In addition, the listing contract requires a broker to notify the seller of "protected buyers" within three days of the termination of the listing contract. This court has consistently concluded that a provision entitling a broker to commission after the listing has expired is read strictly against the broker. *Dunn & Stringer Inv. Co. v. Krauss*, 264 Wis. 615, 619, 60 N.W.2d 346 (1953); *Klapinski v. Polewski*, 19 Wis. 2d 124, 126–27, 119 N.W.2d 424 (1963).

*Sonday*, 293 Wis. 2d 458, ¶ 31.[6]

---

[6] Like the listing contract in *Sonday v. Dave Kohel Agency, Inc.*, 2006 WI 92, 293 Wis. 2d 458, 718 N.W.2d 631, the listing contract here requires that, in order for a potential buyer to be a "Protected Buyer" based on discussing with the broker "the potential terms upon which buyer might acquire an interest in the Property," the broker had to deliver the name of the buyer

We understand the Guyants to mean that, regardless of whether the meaning of the disputed language is plain or ambiguous, we must construe it against the broker.

¶ 29. We recognize that in the quoted statement the *Sonday* court does not say that the strict construction rule applies against the broker *if there is an ambiguity in the contract language.* However, we do not read *Sonday* to deviate from the established rule that we construe language in a listing contract against the broker only if there is an ambiguity. We reach this conclusion based on the following considerations.

¶ 30. First, in *Dunn*, 264 Wis. at 619, the first case cited by the *Sonday* court as authority for the rule, the statement of the rule includes the condition "in case of any ambiguity." Second, that condition is part of the statement of the rule in subsequent cases. *See, e.g., Manfield v. Smith*, 88 Wis. 2d 575, 594–95, 277 N.W.2d 740 (1979); *Boutelle v. Chrislaw*, 34 Wis. 2d 665, 677, 150 N.W.2d 486 (1967); *E.M. Boerke, Inc. v. Williams*, 28 Wis. 2d 627, 634, 137 N.W.2d 489 (1965). Third, in *Klapinski*, the second case cited by the *Sonday* court as authority for the strict construction rule, the court did not refer to the strict construction but instead rested its construction on the plain language of the contract. *Klapinski*, 19 Wis. 2d at 126–27.

¶ 31. Finally, the *Sonday* court's analysis is consistent with applying the strict construction rule only when there is an ambiguity to resolve. In the paragraph immediately preceding the paragraph on which the Guyants rely, the *Sonday* court concludes that the contract definition of "negotiate"—"discuss[ion] [of] 'potential terms upon which the buyer might acquire an

in writing within three days of the expiration of the listing contract.

interest in the Property' "—is clear and unambiguous. *Id.*, ¶ 30. Therefore, the court states, "we will construe it as it stands." *Id.* (citation omitted). Then, after the quoted paragraph, the court proceeds to apply the definition of "negotiate" to the facts of the case without again mentioning the strict construction rule. As we read *Sonday*, because the court concluded there was no ambiguity, there was no need to apply the rule.

¶ 32.   Even if we assume without deciding that contract language may be unambiguous when applied to certain facts but ambiguous when applied to others, we see no ambiguity in the contract definition of "negotiate" when applied to the facts in this case. We have already concluded that the broker/no-broker discussion plainly comes within the contract definition of "negotiate." There is therefore no ambiguity to resolve by applying the strict construction rule.

¶ 33.   In summary, we conclude that Bushman did discuss with the Guyants "potential terms upon which [she] might acquire an interest in [their] Property" when they discussed Bushman's desire not to have a broker involved on behalf of the Guyants and ended the discussion with Lisa's agreement that she would call Bushman after the expiration of the listing contract. Therefore, Bushman meets the definition of "Protected Buyer" and the listing contract was extended one year as to her. Because Bushman purchased the Guyants' home within that one-year period, First Weber is entitled to a commission of 6.5% of the $68,000 Bushman paid for their home.

## CONCLUSION

¶ 34.   We reverse the circuit court's order dismissing First Weber's action and remand with instructions

to enter a judgment against the Guyants for $4,420, the commission due First Weber under the listing contract.

*By the Court.*—Order reversed and cause remanded with instructions.