Mark SONDAY and Joyce Sonday,
Plaintiffs-Appellants,

v.

DAVE KOHEL AGENCY, INC.,
Defendant-Respondent.

Supreme Court

*No. 2004AP2322. Oral argument April 27, 2006.
—Decided July 11, 2006.*

2006 WI 92

(Also reported in 718 N.W.2d 631.)

For the plaintiffs-appellants, there were briefs by *John L. DeStefanis, Catherine A. Goodman,* and *Fuchs, DeStefanis & Boyle, S.C.,* Milwaukee, and oral argument by *John L. DeStefanis.*

For the defendant-respondent, there was a brief by *Susan J. Marguet, Brian Sajdak,* and *Weiss Berzowski Brady LLP,* Delafield, and oral argument by *Susan J. Marguet.*

An amicus curiae brief was filed by *Debra P. Conrad* and *Reese C. Phillips,* Madison, on behalf of the Wisconsin Realtors Association.

¶ 1. LOUIS B. BUTLER, JR., J. This case comes to us on certification from the court of appeals. Mark and Joyce Sonday appeal from a summary judgment in favor of Dave Kohel Agency, Inc., with whom the Sondays listed two parcels of commercial property. The circuit court, Honorable Michael S. Fisher, Kenosha County, granted summary judgment in favor of Kohel and dismissed the Sondays' action seeking a declaration that Kohel did not have a right to a commission under its listing contract with the Sondays because the Sondays' properties were transferred as the result of a condemnation action. On appeal, the Sondays contend that Kohel is not entitled to a commission because a condemnation is not a "transaction" as the term is defined under Wisconsin law, nor as the term is used in the listing contract.

¶ 2. The court of appeals certified two questions to this court: 1) is a real estate broker entitled to a broker's commission under a listing contract when the

listed real estate is condemned and acquired by a governmental agency during the listing; and 2) if the real estate listing contract permits recovery of a broker's commission in a condemnation, does public policy preclude such payment?

¶ 3. We conclude that the transfer of property by a condemnation action constitutes a sale under the terms of the contract in this case. We further conclude that the real estate broker is entitled to a 6 percent commission based on the jurisdictional award. We also conclude that public policy does not preclude Kohel from recovering a commission in this case. We therefore affirm the circuit court's grant of summary judgment. Because we conclude that the condemnation action constituted a sale under line 49 of the commission clause as opposed to a transaction under line 52, we reverse the amount of the judgment and remand the cause to the circuit court for further proceedings consistent with this opinion.

I

¶ 4. The parties stipulated to the following facts. Mark and Joyce Sonday ("the Sondays") owned two parcels of commercial property in the Village of Pleasant Prairie, Wisconsin ("Village"). The Sondays owned and operated a military museum on one of the parcels, and Sonday's Vans, an automotive repair, restoration, and customization business, on the other parcel.

¶ 5. On May 15, 2002, the Sondays contracted with the Dave Kohel Agency, Inc. ("Kohel") to list the two parcels.[1] Both Dave Kohel, Jr. and Dave Kohel, Sr. are licensed real estate brokers in Kenosha. The parties

---

[1] The Sondays had earlier contracted with the Dave Kohel Agency (Kohel) from September 1998 to September 2000 to list

used the standard WB-5 commercial listing contract form approved by the Wisconsin Department of Regulation and Licensing. The contract provided a 6 percent commission and ran for a term of one year. Kohel listed the military museum parcel for $2,250,000, and the Sonday's Vans parcel for $800,000.

¶ 6. On May 28, 2002, David Kohel, Sr. met with Pleasant Prairie Village Administrator Michael Pollocoff. In an affidavit, David Kohel, Sr. stated that he met with Pollocoff "about Dave Kohel Agency, Inc.'s listing of the Sondays' and other properties and to discuss the Village's possible purchase and the properties' development potential." Affidavit of David Kohel, Sr., February 4, 2004. According to an affidavit by Pollocoff,

> In the year 2002, I was approached by Mr. Dave Kohel regarding the properties of Mr. and Mrs. Joyce Sonday [sic].
>
> Mr. Kohel suggested the Village of Pleasant Prairie purchase the Sondays' properties for an amount in the two million dollar range.
>
> I advised Mr. Kohel that the Village of Pleasant Prairie was not interested in purchasing the Sondays' properties for two million dollars.
>
> The Village of Pleasant Prairie did not negotiate with or through Dave Kohel Agency, Inc. for the purchase of the Sondays' properties at that time.
>
> The Village of Pleasant Prairie has not since negotiated with or through Dave Kohel Agency, Inc. for the purchase of the Sondays' properties.

---

the parcel containing Sonday's Vans, and from July 1999 to January 2000 to list the military museum parcel. Neither parcel was sold during the terms of these earlier contracts. These contracts are not at issue in this case.

All actions for obtaining the Sondays' properties have been done under state statutes for eminent domain through the Community Development Authority and through HNTB.

Affidavit of Michael R. Pollocoff, March 15, 2004.

¶ 7. In early June 2002, the Village held a hearing to consider the possible condemnation of properties in the vicinity of I-94, State Highway 165, and County Highway Q ("Redevelopment Area"), which included the Sondays' properties. On June 17, 2002, the Village voted to establish a community development authority ("CDA") to implement a proposed "master land use plan" to eliminate blight and redevelop properties in the Redevelopment Area ("Redevelopment Plan").

¶ 8. In a letter from the Sondays' attorney, dated July 3, 2002, the Sondays instructed Kohel not to contact the Village on their behalf, and informed Kohel of their belief that Kohel would not be entitled to any commission under the listing contract if the Village acquired the properties by a condemnation action. The letter states, in relevant part:

> It is our understanding that you induced Mr. Sonday to sign the contract by indicating that you had lined up a buyer to purchase the property for more than $2,000,000.
>
> If you did have such a buyer available, you have not provided him; if you had the Village of Pleasant Prairie in mind because of your knowledge of the pending condemnation, it is our opinion that you would not be entitled to a commission based upon any funds paid to the Sondays by the Village. Mr. Sonday will honor the contract to the extent that you produce a buyer, other than the Village of Pleasant Prairie, willing to pay $2,500,000 for his land.

We are writing specifically to indicate that you do not have authority to negotiate on Mr. Sonday's behalf with the Village, are directed not to contact them, and you will not be compensated in any regard if the pending condemnation results in a negotiated purchase with the Village of Pleasant Prairie.

¶ 9. In response to this letter, Kohel recorded its intent to claim liens on the two properties with the Kenosha County Register of Deeds on September 19, 2002, and served notices of its intent to claim broker liens against the properties on September 26, 2002, in accordance with Wis. Stat. § 779.32(3) (2003–04).[2]

¶ 10. The CDA adopted by-laws and appointed Village Administrator Pollocoff as the Executive Director of the CDA on September 25, 2002. On December 4, 2002, the CDA met to consider a draft of the Redevelopment Plan. The CDA discussed, among other properties, the two parcels owned by the Sondays, examined photographs taken of the Sondays' properties, and referred to observations made previously by the CDA of

---

[2] Under this statute,

A broker has a lien under sub. (2) (a) or (b) only if the broker files or records a written notice of intent to claim a lien under this section at the office of the register of deeds for the county in which the commercial real estate is located and delivers a copy of the notice to the person owing the commission under sub. (2)(a) or (b). A broker has a lien under sub. (2)(c) only if the broker provides a written notice of intent to claim a lien under this section to the person owing the compensation under sub. (2)(c). All notices required under this subsection shall contain the name of each party to the agreement under which the lien is claimed, the date that the agreement was entered into and a brief description of the commercial real estate on which the lien is intended to be claimed . . . .

Wis. Stat. § 779.32(3). All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

the Sondays' properties on October 22 and November 22, 2002. The CDA concluded that the Sondays' use of the property was nonconforming with Village Zoning Ordinance requirements and that blight conditions existed. The CDA delivered a copy of a report to owners of property affected by the proposed Redevelopment Plan, which included the Sondays. On January 2, 2003, the CDA held a public hearing, allowing members of the public to comment on and ask questions about the proposed Redevelopment Plan. Mr. Sonday attended this meeting, and stated that he was offended by the CDA's description of his properties.[3] Mr. Sonday also noted that he had no problem relocating his museum. At this hearing, there was no discussion regarding compensation for the property. The record reflects no further discussions between the Sondays and the CDA prior to the May 15, 2003, termination of the original contract.

¶ 11. The Village found the Redevelopment Area to be blighted on January 6, 2003. Resolution of the Village of Pleasant Prairie Board of Trustees No. 03–03,

---

[3] At the December 4, 2002, CDA meeting, the members of the CDA discussed the Redevelopment Plan Project Area as "blighted" and "nonconforming with Village Zoning Ordinances" because there existed a "substantial number of substandard, deteriorated or deteriorating structures, predominance of defective or inadequate street layout, faulty lot layout in relation to size, adequacy, accessibility or usefulness, unsanitary or unsafe conditions, deterioration of site or other improvements . . . constitut[ing] an economic or social liability and [] a menace to the public health or welfare in its present condition and use." The Sondays' museum parcel was described as a "military museum salvage yard." At the January 2, 2003, public hearing before the CDA, Mark Sonday stated that he was offended that his property had been described as a junkyard and that they incorrectly described his van shop as a vacant commercial building.

January 6, 2003. On February 12, 2003, the Village and the CDA approved the Redevelopment Plan. On April 16, 2003, the CDA approved an amended relocation order, permitting acquisition of the Redevelopment Area, including Sondays' properties.

¶ 12. On May 9, 2003, pursuant to lines 63–76 of the listing contract, Kohel served the Sondays with a notice of extension of the May 2002 listing contracts for one year with respect to "protected buyers" as defined in the contract. Kohel listed the Village, Panattoni Company, and Trammell Crow as protected buyers.

¶ 13. On June 3, 2003, the Sondays demanded Kohel remove its "intent to file lien" from the Sondays' title. Kohel responded on June 12, 2003, stating that the Sondays breached the listing contract by refusing to allow Kohel to negotiate on their behalf and attempting to terminate the listing contract as to the Village.

¶ 14. The CDA approved a second amended relocation order and plan permitting the acquisition of the Redevelopment Area on August 20, 2003. On October 27, 2003, the Sondays received an offer on behalf of the CDA to purchase the military museum parcel for $812,300. The offer was later increased to $850,000 on January 20, 2004. On December 4, 2003, the Sondays received an offer from the CDA to purchase the van business parcel for $532,000. The Sondays made no response to these offers.

¶ 15. On February 19, 2004, the Sondays received statutory jurisdictional offers, pursuant to Wis. Stat. § 32.05(3), on behalf of the CDA to purchase the military museum parcel for $850,000 and the van business parcel for $532,000. The Sondays did not respond to the jurisdictional offer. Because the Sondays did not accept the jurisdictional offer, on February 23, 2004, the CDA filed a petition with the Kenosha County circuit court,

pursuant to § 32.05(7), for proceedings on the condemnation action. The CDA also filed two lis pendens with the Kenosha County Register of Deeds, encumbering both parcels, pursuant to § 32.05(7).

¶ 16. On March 4, 2004, the CDA filed statutory compensation awards with the Kenosha County Clerk of Courts and recorded the awards with the Register of Deeds, as required by Wis. Stat. § 32.05(7). The jurisdictional award of $1,382,000 was paid by the CDA to the Sondays, and title to the property transferred from the Sondays to the CDA, pursuant to § 32.05(7)(c). The Sondays appealed the amount of the jurisdictional award, and that appeal was settled on December 17, 2004.[4]

¶ 17. On March 16, 2004, the Sondays and Kohel stipulated that the Sondays would hold $228,750 in escrow for Kohel pending resolution of their disagreement over Kohel's commission under the terms of the contract.

¶ 18. On July 9, 2004, the Sondays sued Kohel, seeking a judgment declaring that Kohel had no right to a commission under the listing contract, and that it was not entitled to file a broker's lien on the properties. Kohel defended against the suit and filed a counterclaim seeking full commission on the listing contracts. Kohel moved for summary judgment on the Sondays' complaint and its counterclaim. The parties filed jointly an extensive stipulation of facts, and submitted affidavits and supporting briefs.

---

[4] *Sonday v. Village of Pleasant Prairie Cmty. Dev. Auth.*, Kenosha County Circuit Court, No. 2004CV748. The settlement included an additional compensation for the Sondays' property for $872,000, plus $8,400 for appraisals and $160,000 for attorneys' fees.

¶ 19. The circuit court for Kenosha County, Honorable Michael S. Fisher, determined that the listing contract was in effect at the time of the transfer of the properties to the CDA. The court granted Kohel's motion for summary judgment, dismissing the Sondays' complaint and ordering the Sondays to pay 6 percent commission on the list prices of the properties, plus attorney fees. The circuit court stayed execution of the judgment upon the Sondays' motion pending the appeal. The court of appeals certified the case to this court, and we accepted certification.

## II

¶ 20. This case is a review of the circuit court's grant of summary judgment. We review a grant of summary judgment de novo, applying the same methodology as the circuit court. *Alvarado v. Sersch,* 2003 WI 55, ¶ 10, 262 Wis. 2d 74, 662 N.W.2d 350. The court will affirm a grant of summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2). *See also Alvarado,* 262 Wis. 2d 74, ¶ 10.

¶ 21. We are asked to determine whether the transfer of property by condemnation is covered under the terms of a particular brokerage contract. "The ultimate aim of all contract interpretation is to ascertain the intent of the parties." *DeWitt Ross & Stevens, S.C. v. Galaxy Gaming & Racing Ltd. P'ship,* 2004 WI 92, ¶ 44, 273 Wis. 2d 577, 682 N.W.2d 839 (quotation

and citation omitted). We interpret a contract to give "reasonable meaning to each provision and without rendering any portion superfluous." Id., 44 (citation omitted).

## III

¶ 22. This case requires us to determine whether the transfer of property by a condemnation action[5] is covered under the WB-5 Listing Contract for purposes

---

[5] The United States and Wisconsin Constitutions prohibit the government from taking private property for public use without just compensation. U.S. Const., amend. V; Wis. Const. art. I sec. 13. Wisconsin Statutes Chapter 32 addresses who may condemn private property and the procedures for a lawful condemnation action. Under this statutory scheme, certain departments, municipalities, boards, commissions, public officers, and corporations are authorized to "acquire by condemnation any real estate and personal property . . . for the purposes specified, in case such property cannot be acquired by gift or purchase at an agreed price." Wis. Stat. § 32.02. Wisconsin Stat. § 32.05 establishes the procedures for the acquisition of private property for transportation matters; § 32.06 addresses the procedures for all acquisitions other than those involving transportation matters.

Because the condemnation in this case involves Wis. Stat. § 66.1333, addressing blight elimination and slum clearance, the condemning authority can choose to proceed with the condemnation under either Wis. Stat. § 32.05 or § 32.06. § 32.05. Here, the CDA's condemnation of the Sondays' property proceeded under § 32.05.

Prior to condemning private property, the government must first "attempt to negotiate personally with the owner or one of the owners or his or her representative of the property sought to be taken for the purchase of the same." Wis. Stat. § 32.05(2a). If the private owner of the property rejects the government's offer(s) to purchase the property, the government

of the broker's commission. We operate under the premise that at least some contract claims are preserved apart from and despite any condemnation action. *See Hastings Realty Corp. v. Texas Co.,* 28 Wis. 2d 305, 317, 137 N.W.2d 79 (1965); *Kilps v. Pawinski,* 27 Wis. 2d 467, 473, 134 N.W.2d 470 (1965).

¶ 23. Under Wisconsin law, a broker is required to enter into a written agreement, such as a listing contract, before providing services to a consumer. Wis. Stat. §§ 240.10[6] and 452.135(1) (2003–04); Wis. Admin. Code § RL 24.08 (Jan., 2001). Wisconsin Stat. § 240.10 is the

is authorized to make a jurisdictional offer for the property. § 32.05(3) & (4). "The owner has 20 days from the date of personal service of the jurisdictional offer . . . in which to accept the jurisdictional offer . . . ." § 32.05(6). If the owner fails to respond within the requisite 20 days, the government may file a petition for condemnation in the circuit court for the county in which the property to be taken is located. § 32.05(7).

Upon filing a petition for condemnation, if the government entity seeking to acquire the property is entitled to condemn the property, the circuit judge assigns the matter to the county's condemnation commissioners, who ascertain the compensation for the taking of the property. Wis. Stat. § 32.08(5). Both the private owner and the government may appeal the commission's award within 60 days of the date the award is filed. § 32.05(10)(a).

[6] In 2004, Wis. Stat. § 240.10 read:

> No broker may provide brokerage services without an agency agreement that authorizes the broker to provide those brokerage services. The agency agreement shall contain a statement of the terms and conditions of the brokerage services that the broker will provide, including a statement required under s. 452.138, if applicable.

We note that this statute was amended by 2005 Wis. Act 87, effective July 1, 2006. The 2003–04 statute is at issue in this case.

primary law that establishes the requirements for listing contracts. If the contract fails to meet the requirements of § 240.10, the broker cannot enforce the right to a commission even if the owner sells to a buyer procured by the broker. *Raskin v. Hack,* 16 Wis. 2d 296, 299, 114 N.W.2d 483 (1962) ("In order to carry out the legislative intent, courts hold void contracts which do not substantially comply with the same.) (citation omitted); *Gilbert v. Ludtke,* 1 Wis. 2d 228, 232, 83 N.W.2d 669 (1957) ("[T]he statute means just what it says and [] there can be no recoveries of real-estate brokers' commissions upon *quantum meruit.*") (citation omitted); *Otto v. Black Eagle Oil Co.,* 266 Wis. 215, 218, 63 N.W.2d 47 (1954) ("[W]e believe that in order to carry out the legislative intent we should hold contracts void which do not substantially comply with the statute.") (citations omitted). *See also Wozny v. Basack,* 21 Wis. 2d 86, 88, 123 N.W.2d 513 (1963); *Hale v. Kreisel,* 194 Wis. 271, 272–73, 215 N.W. 227 (1927); *Gifford v. Straub,* 172 Wis. 396, 399–400, 179 N.W. 600 (1920).

¶ 24. In 1982, the Wisconsin Legislature created the Department of Regulation and Licensing ("Department"), granting the Department rule-making authority,[7] and directing the Department to approve forms for

---

[7] Wisconsin Stat. § 227.11(2)(b) confers rulemaking authority on the Wisconsin Department of Regulation and Licensing (Department) to effectuate the purpose of chapter 452. *See also* § 452.07 (directing the Department to review rules that affect the real estate profession). In addition, chapter 452 establishes the Department's responsibilities with regard to the licensing and education of brokers and salespersons. *See* Wis. Stat. §§ 452.03, 452.05, 452.09, 452.10, 452.11, 452.12, 452.14, 452.15, and 452.17, and Wis. Admin. Code ch. RL 1, 2, 6, 12, 13, 17, 22, 23, 25, and 26 (Jan., 2001) of the rules. *See also* Minter, Scott C. & Richard J. Staff, *Wisconsin Real Estate Law* 2, 21 (2003).

use in real estate practice. Wis. Stat. § 452.05(1)(b); Admin. Code § RL 16.03. In compliance with these statutory and administrative code requirements, the Department has prepared and approved numerous forms, including the WB-5 Commercial Listing Contract-Exclusive Right to Sell ("WB-5 Listing Contract"), at issue in this case.[8] The WB-5 Listing Contract was made available on April 1, 2000, and brokers have been required to use this form since September 1, 2000.[9]

A

¶ 25. Before we determine whether a condemnation action is covered under the WB-5 Listing Contract, a threshold issue is whether the contract was in effect when the Village condemned the Sondays' property in March 2004. Without a valid listing contract, Kohel would not be entitled to any commission. *See Raskin,* 16 Wis. 2d at 299.

¶ 26. The listing contract between the Sondays and Kohel was for a one-year term, beginning on May 15, 2002, and terminating at midnight on May 15, 2003. The CDA took legal title of the Sondays' property

---

[8] The Department has approved, for use by brokers:

Forms prepared and approved by the state bar of Wisconsin for deeds, mortgages, mortgage notes, truth-in-lending disclosures, land contracts, release of mortgage, satisfaction of mortgage, assignment of mortgage and assignment of land contract.

Wis. Admin. Code § RL 16.03(1)(a).

[9] The administrative rules that regulate the use of approved forms are found in RL 16. Under RL 16.04, licensed brokers must use approved listing form in every case where there is an appropriate listing form.

through condemnation action on March 4, 2004. Although the March 2004 condemnation action is clearly not within the original one-year term of the contract, the WB-5 Listing Contract includes provisions to extend the listing for an additional year when certain conditions are met. We must therefore determine whether any of the contractual conditions for extending the listing were met that would have extended the listing to include March 4, 2004.

¶ 27. The contract can be extended for one year for:

> any buyer who personally or through any person acting for such buyer either negotiated to acquire an interest in the Property or submitted a written offer to purchase, exchange or option during the term of this Listing.

The contract further establishes:

> If the extension is based on negotiation, the extension shall be effective only if the buyer's name is delivered to Seller, in writing, no later than three days after the expiration of the Listing, unless Seller was directly involved in discussions of the potential terms upon which buyer might acquire an interest in the Property.

¶ 28. Based on these provisions, the term of the listing contract is automatically extended for one year, extending the broker's ability to earn commission, if during the term of the listing contract, the buyer (1) submitted a written offer to purchase; or (2) negotiated directly with the *seller.* If the buyer negotiated with the *broker* during the term of the listing contract, then the listing contract is extended for one year only if the broker delivers the potential buyer's name to the seller within three days of the expiration of the contract term.

¶ 29. In 1999, the Department revised the WB-5 Listing Contract form to define the term "negotiated." Lines 71–73 of the current listing contract between the parties defines "negotiated" as a discussion of "the potential terms upon which buyer might acquire an interest in the Property or to attend an individual showing of the Property."

¶ 30. We conclude that the contractual definition of "negotiate" is clear and unambiguous. *Gottsacker v. Monnier,* 2005 WI 69, ¶ 22, 281 Wis. 2d 361, 697 N.W.2d 436 ("When the terms of a contract are plain and unambiguous, we will construe it as it stands."). In order to satisfy the definitional requirements for a negotiation, therefore, a broker must discuss "potential terms upon which the buyer might acquire an interest in the Property."[10]

---

[10] In 1993, the Wisconsin Legislature created subsection (5m) to Wis. Stat. § 452.01, which defined "negotiate" as applied to real estate practice in Wisconsin. The relevant subsection of this statute states:

> "Negotiate" means to act as an intermediary between the parties to a transaction, including . . . [f]acilitating or participating in the parties' discussion of the terms of a contract or agreement concerning a transaction. . . .

Wis. Stat. § 452.01(5m); 1993 Wisconsin Act 127. The legislature further defined a "party" as a person "seeking to sell, exchange, buy or rent an interest in real estate . . . ." Wis. Stat. § 452.01(5r), and a "transaction" as "the sale, exchange, purchase or rental of . . . an interest in real estate." Wis. Stat. § 452.01(10). (We note that the Wisconsin Legislature amended this statute in 2005 Wis. Act. 87.)

We recognize that the statutory definition is not fully reflected in the form contract and that the contractual definition appears to be broader than the statutory definition. The contractual language involving "potential terms" upon which

¶ 31. In addition, the listing contract requires a broker to notify the seller of "protected buyers" within three days of the termination of the listing contract. This court has consistently concluded that a provision entitling a broker to commission after the listing has expired is read strictly against the broker. *Dunn & Stringer Inv. Co. v. Krauss,* 264 Wis. 615, 619, 60 N.W.2d 346 (1953); *Klapinski v. Polewski,* 19 Wis. 2d 124, 126–27, 119 N.W.2d 424 (1963).

¶ 32. In the present case, the CDA did not submit a written offer to purchase the Sondays' property during the term of the original listing contract. In addition, prior to the termination of the May 15, 2002, listing contract, the Sondays' interaction with the CDA was limited. Although Mr. Sonday attended the January 2, 2003, CDA public hearing and shared his comments on the proposed Redevelopment Plan with the CDA, the Sondays and the CDA did not discuss potential terms upon which the CDA might acquire the Sondays' property.

¶ 33. We must therefore determine if Kohel negotiated with the CDA prior to May 15, 2003, and properly delivered the CDA as a protected buyer to the Sondays within three days of the termination of the original contract.

██

¶ 34. We conclude that Kohel's actions constitute a "negotiation" with the Village, as defined in the listing

the buyer "might acquire" an interest in the property does not require the potential buyer to become a "likely purchaser." However, because neither party briefed or argued the propriety of the contractual definition being different than statutory definition, we do not reach this issue. *Milwaukee Metro. Sewerage Dist. v. City of Milwaukee,* 2005 WI 8, ¶ 87 n.30, 277 Wis. 2d 635, 691 N.W.2d 658. We instead interpret the contract.

contract. Kohel initiated contact with the Village of Pleasant Prairie on May 28, 2002. Kohel suggested to the Village that it purchase the Sonday property for approximately $2 million. The Village refused the offer. During this May 28, 2004, conversation between Kohel and the Village, Kohel and Village Administrator Pollocoff clearly discussed "potential terms upon which the buyer might acquire an interest in the Property," fulfilling the listing contract requirement.

█

¶ 35. We also conclude that Kohel sufficiently notified the Sondays that the CDA was a protected buyer. Within three days of the termination of the original one-year term of the listing contract, Kohel notified the Sondays that the Village of Pleasant Prairie was a protected buyer. The Sondays contend that because Kohel listed the Village, and not the CDA, Kohel failed to notify the Sondays that the CDA was a protected buyer. We disagree.

¶ 36. The Sondays correctly assert that, under the Wisconsin Statutes, a redevelopment authority is "independent, separate and distinct" from the municipality that creates the authority.[11] However, The "Resolution Creating the Community Development Authority of the

---

[11] Under current law,

> A city may . . . adopt an ordinance or resolution creating a housing and community development authority which shall be known as the "Community Development Authority" of the city. *It is a separate body politic for the purpose of carrying out blight elimination, slum clearance, urban renewal programs and projects and housing projects.* The ordinance or resolution creating a housing and community development authority may also authorize the authority to act as the agent of the city in planning and carrying out community development programs and activities approved by the mayor and common council . . . .

Wis. Stat. § 66.1335(1) (emphasis added).

Village of Pleasant Prairie, Wisconsin," which passed unanimously, explicitly established that the CDA was an "agent of the Village." Resolution No. 02–21, June 17, 2002. In addition, when the Village of Pleasant Prairie established the CDA, Village Administrator Pollocoff stressed that the CDA would function "under the umbrella of the Village Board and the Village operations" in order to "implement the master land use plan for the Village that the Plan Commission has created, and do so only under the approval of the Village Board to implement qualified redevelopment plans." Village Board Meeting Minutes, June 17, 2002. Pollocoff further emphasized that the CDA "has no authority other than what the Board gives it," and that the resolution granted the CDA authority only to prepare plans, which would be subject to approval by the Board and the Plan Commission, and granted the CDA the authority to acquire property. *Id.*

¶ 37.　In addition, in 1983, this court reviewed an earlier version of the WB-5 Listing Contract, which read, in relevant part:

> If a sale or exchange is made or a purchaser procured by the Broker, by the undersigned Seller, or by any other person, at the price and upon the terms specified herein, or at any other terms and price accepted by the

In addition, for purposes of redevelopment in furtherance of blight elimination and slum clearance, a community development authority is

> an independent, separate and distinct public body and a body corporate and politic, exercising public powers determined to be necessary by the state to protect and promote the health, safety and morals of its residents, and may take title to real and personal property in its own name.

Wis. Stat. § 66.1333(3)(f).

undersigned Seller, during the term of this contract, or if sold or exchanged within twelve (12) months after the termination of same to *anyone* with whom the Broker negotiated during the term of this contract and whose name the Broker has submitted to Seller in writing prior to the expiration date of this contract, the Seller agrees to pay Broker a commission of ten per cent (10%) of the sale price.

*United Farm Agency of Wisconsin, Inc. v. Klasen,* 112 Wis. 2d 634, 637, 334 N.W.2d 110 (1983) (quoting Form WB-12, Hotel, Motel, Resort—Exclusive Listing Contract) (emphasis added). This court concluded that, under the terms of the contract, "[t]he word "anyone" is sufficiently broad so as to include a likely purchaser who ultimately purchases the property *in combination with other parties." Id.* at 642. Although the current version of the WB-5 Listing Contract does not use the term "anyone," the contractual reference to "any buyer" must similarly include a buyer who purchases the property, even if the buyer has purchased the property in combination with another party.

¶ 38. Consequently, because the CDA was an agent of the Village and authorized to act only with the approval of the Village Board, the Village was one of the buyers, having purchased the Sondays' properties with the CDA. We therefore conclude that when Kohel named the Village as a protected buyer, because the Village ultimately purchased the properties along with the CDA, the listing contract was properly extended through May 15, 2004.

## B

¶ 39. Having concluded that the WB-5 listing contract was in effect when the condemnation action was finalized in March 2004, we next examine whether the

480

condemnation action entitles Kohel to a commission under the terms of that contract.

¶ 40. Under the Commission Clause in the WB-5 Listing Contract, lines 49–55, the broker earns a commission if one of five conditions occurs.[12] In particular, according to lines 49 and 57 of the contract, a commission of 6 percent of the sale price is earned if the "Seller sells or accepts an offer which creates an enforceable contract for the sale of all or any part of the Property." Under lines 52 and 59 of the contract, the broker earns 6 percent interest of the list price if "[a] transaction occurs which causes an effective change in ownership or control of all or any part of the Property." The contract does not specifically address whether the transfer of property by condemnation constitutes a sale or other form of transaction.

¶ 41. This court has not previously evaluated whether a condemnation action constitutes a sale or transaction for purposes of a broker's commission. Various jurisdictions have concluded that a condemnation action cannot constitute a sale, whereas other jurisdictions have concluded that a condemnation action does constitute a sale. We find more persuasive the

---

[12] Under lines 49–55 of the WB-5 Listing Contract, the five conditions are: (1) if the seller sells or accepts an offer which creates an enforceable contract for all or any part of the property; (2) if the seller grants an option to purchase all or any part of the property; (3) if the seller exchanges or enters into a binding agreement to exchange all or any part of the property; (4) if a transaction occurs which causes an effective change in ownership or control of all or any part of the property; or (5) if the seller, broker, or a third party procures a purchaser at the price and terms set forth in the listing, even if the seller does not accept the offer.

reasoning among the jurisdictions that consider a condemnation action to be a sale.

¶ 42. The jurisdictions that have concluded that a transfer of property by condemnation does not constitute a sale for purposes of a broker's commission have relied on the fact that the brokerage contract under review did not contain any explicit reference to a condemnation action. According to these courts, a condemnation action should constitute a sale only when the contract explicitly defines "sale" to include a condemnation action. *See, e.g., Forest Preserve Dist. of Du Page County v. Brookwood Land Venture*, 595 N.E. 2d. 136 (Ill. App. Ct. 1992) (concluding that a condemnation was not a sale because the "clear and unambiguous language of the termination agreement applies to a 'purchase/sale agreement' that is 'the result of good faith arm's length negotiations' "); *St. Joe Corporation v. McIver,* 875 So. 2d 375, 381 (Fla. 2004) ("[I]f the seller and the broker agreed to, and did, pursue condemnation as an acceptable substitute for a sale, then the broker should be entitled to commission when the property is condemned. If, however, the seller specifically authorized the broker to pursue only a sale, then the broker would not be entitled to a commission for a condemnation."); *Wilson v. Ross Investment Co.*, 180 P.2d 226, 230 (Colo. 1947) (noting that no court in any other jurisdiction had previously evaluated this issue with regard to a broker's contract for commission, the court concluded that the condemnation action did not constitute a sale under the broker's contract for commission when "sale" meant "a contract between parties to give and to pass rights of property for money which the buyer pays or promises to pay the seller for the thing bought or sold" because there was no contract between the seller and the

government purchaser—there was never a meeting of the minds regarding the price and acreage).

¶ 43. In contrast, other jurisdictions have concluded that the term "sale," unless specifically limited to voluntary or arms-length transactions, includes the transfer of property by condemnation. *See, e.g., United States v. 27,233.21 Acres of Land,* 589 F. Supp. 1121, 1124 (Colo. Dist. Ct. 1984) (evaluating whether a condemnation was a sale within the meaning of a lease, the federal district court concluded that a condemnation action constitutes a sale and "[t]he fact that it is an enforced sale, where the government stands toward the owner as buyer toward seller, does not alter this conclusion"); *People v. County of Santa Clara,* 79 Cal. Rptr. 787, 790 (Cal. Ct. App. 1969) (evaluating a stamp tax law, the court concluded that a final order of condemnation is an instrument by which real property is vested in the condemnor, noting that "neither the ordinance in question nor the enabling legislation limit the applicability of the legislation to 'voluntary' as contrasted with 'involuntary' sales"); *United States v. Certain Parcels of Land in Loyalstock TP, Lycoming County, PA.,* 51 F. Supp. 811, 812 (Dist. Ct. Penn. 1943) (in reviewing a landlord-tenant lease, the court concluded that a condemnation action is a transaction that "partakes of all the incidents of a 'sale,' as that term is used. It is true that the transaction is an involuntary sale of the property but it is a sale nonetheless.") (citation omitted); *Jackson v. State,* 106 N.E. 758, 758 (N.Y. Ct. App. 1914) (concluding that, after appropriating a warehouse, the government did not have the right to reject the fixtures in the warehouse and refuse to pay for them, reasoning that a condemnation action "is an enforced sale, and the State stands toward the owner as buyer toward seller."); *American Creameries Co. v.*

*Armour Co.,* 271 P. 896, 692 (1928) (reviewing a landlord-tenant lease, the court concluded that "the transaction by which the land is condemned . . . in a legal sense is a purchase of the land, or an interest in the land . . .").

¶ 44. The cases that concluded that a condemnation action does not constitute a sale are distinguishable from the present case. This case does not involve unambiguous contractual language requiring that a sale be the result of an arms-length negotiation, *see Forest Preserve,* 595 N.E. 2d at 141, nor does this court need to rely on the definition of "sale" from Corpus Juris, which requires that the sale be a contract between the parties, *see Wilson,* 180 P.2d at 230. In addition, we find persuasive the rationale employed by the jurisdictions that have concluded that a condemnation action constitutes a sale, particularly, *27,223.21 Acres of Land,* 589 F. Supp. 1121. In that case, the court examined a lease that preserved the state's right to cancel the lease if the state elected to sell any part of the premises. *Id.* at 1124. The court concluded that a condemnation action constituted a sale for purposes of that lease. *Id.* at 1125. The court reasoned that when a contract contains "both a 'sale' clause and a 'condemnation' clause, the parties can only mean a 'voluntary sale' in the sale provision." *Id.* at 1124. On the other hand, when a contract contains only a sale clause, and no condemnation clause or other express limitation on the term "sale," a condemnation action can constitute a sale within the meaning of that contract. *Id.* at 1125. The court emphasized that the parties to the contract had made a promise to relinquish possession in the event of a sale and the fact that the "actual transfers were effected by involuntary sales had no impact on that promise." *Id.*

¶ 45. In a condemnation action in Wisconsin, the title to the property is conveyed to the government and the title vests in that government entity as of the date and time of the recording of the compensation award. Wis. Stat. § 32.05(7)(c). Because the transfer of title in exchange for compensation constitutes a sale,[13] and because a condemnation action transfers title in exchange for compensation, we conclude that a condemnation action constitutes a sale, albeit a forced sale, for purposes of the Department-approved WB-5 Listing Contract. The WB-5 Listing Contract ensures a broker will earn commission if the "Seller sells or accepts an offer which creates an enforceable contract for the sale of all or any part of the Property." This contractual provision does not limit the applicability of the contract to "voluntary" or "arm's-length" sales. *Compare Forest Preserve*, 595 N.E.2d at 141. The contract also does not specifically address condemnation actions. In signing the WB-5 Listing Contract, the parties agreed that the broker would earn 6 percent commission if the seller sold any or all of the listed property. That the actual sale of the property was involuntary has no impact on this agreement. We therefore conclude that the transfer of this property by condemnation action from the Sondays to the CDA constituted a sale under the WB-5 listing contract.[14]

---

[13] *Bruns v. Rennebohm Drug Stores, Inc.*, 151 Wis. 2d 88, 98, 442 N.W.2d 591 (Ct. App. 1989) ("A sale has been defined as 'the exchange of an interest in real or personal property for money or its equivalent.'") (citing *Mansfield v. Dist. Agric. Ass'n. No. 6*, 97 P. 150 (1908)).

[14] Under line 52 of the WB-5 Listing Contract, a broker has earned commission if "[a] transaction occurs which causes an effective change in ownership or control of all or any part of the

¶ 46. This conclusion supports Wisconsin's long-standing public policy in favor of promoting certainty in real estate title transfers. *Steiner v. Wisconsin Am. Mut. Ins. Co.,* 2005 WI 72, ¶ 54, 281 Wis. 2d 395, 697 N.W.2d 452; *Maxon v. Ayers,* 28 Wis. 612 (1871). Concluding that a condemnation action constitutes a sale embodies this public policy of finality and clarity for passage of title. *Steiner,* 281 Wis. 2d 395, ¶ 54.

## C

¶ 47. Because the condemnation action constitutes a sale, we next examine the issue of Kohel's commission under the terms of the WB-5 Listing Contract.

¶ 48. The Wisconsin Statutes establish clear procedures for transferring title of property pursuant to a condemnation action. On or before the date of the taking, the condemning authority must issue a check to the condemnee(s) for the amount of the jurisdictional

---

Property." The percentage commission earned by the real estate broker is calculated differently depending upon whether the commission is earned through a transaction or a sale. WB-5 Listing Contract, lines 57–59. The commission is based on the purchase price if the commission is earned through a sale, and based on the listing price if the commission is earned through a transaction. *Id.* Therefore, a sale is treated differently for purposes of calculating commission under the WB-5 Listing Contract. For purposes of this contract, a transaction must be something other than when a "Seller sells or accepts an offer which creates an enforceable contract for the sale of all or any part of the Property." *Id.* line 49. Because we conclude that a condemnation action constitutes a sale for purposes of the WB-5 Listing Contract, we conclude that a condemnation action does not constitute a "transaction" as defined in the contract.

award. Wis. Stat. § 32.05(7)(d). Upon proper service and payment of the award to the condemnee by the condemning authority, the jurisdictional award is recorded with the county register of deeds. § 32.05(7)(c). At the time that the award is recorded, title in fee simple transfers to the condemning authority. *Id.*

¶ 49. The transfer of title in exchange for compensation constitutes a sale.[15] Under the WB-5 Listing Contract, a broker's commission is earned when the property is sold. WB-5 Listing Contract, lines 49, 57. We therefore conclude that the award recorded with the county register of deeds and paid to the condemnee, which causes the transfer of title, is the proper basis for the broker's commission.

¶ 50. In the present case, pursuant to Wis. Stat. § 32.05(7)(d), the CDA compensated the Sondays $1,382,000 for the two properties on March 4, 2004. The CDA's jurisdictional award was recorded with the Kenosha County Register of Deeds on March 4, 2003. Pursuant to Wis. Stat. § 32.05(7)(c), title to the property transferred from the Sondays to the CDA when this compensation award was recorded. We therefore conclude that the award recorded with the Kenosha County Register of Deeds, pursuant to Wis. Stat. § 32.05(7)(c), constitutes the proper basis for Kohel's commission. Kohel has, therefore, earned a 6 percent commission based on the jurisdictional award of $1,382,000.

¶ 51. We recognize that parties can appeal the amount of the jurisdictional award and may be awarded additional compensation based on the outcome of that litigation. Wis. Stat. § 32.05(9). In this case, the Son-

---

[15] *Bruns,* 151 Wis. 2d at 98.

days appealed the March 4, 2004 condemnation award. *Sonday v. Village of Pleasant Prairie Cmty. Dev. Auth.,* Kenosha County Circuit Court, No. 2004CV748. The case was settled on December 17, 2004, and the Sondays were awarded an additional $872,000. *Id.* However, Kohel was not involved in that appeal. In addition, the long-standing policy of promoting certainty, finality, and clarity for passage of title in real estate transactions,[16] requires that the broker's commission be based on the jurisdictional award paid at the time the title is transferred.

IV

¶ 52. The second question certified by the court of appeals asks whether public policy prohibits Kohel from recovering commission because the property was transferred as the result of a condemnation action. We conclude that it does not.

¶ 53. This court has consistently recognized that parties are free to contract and has endeavored to protect the right to contract by ensuring that promises will be performed. *State ex rel. Journal/Sentinel, Inc. v. Pleva,* 155 Wis. 2d 704, 710, 456 N.W.2d 359 (1990); *Watts v. Watts,* 137 Wis. 2d 506, 521, 405 N.W.2d 305 (1987). Yet, contractual rights are not absolute and a contract that is deemed contrary to public policy is void and unenforceable. *Heyde Companies, Inc. v. Dove*

---

[16] *See Steiner v. Wisconsin Am. Mut. Ins. Co.,* 2005 WI 72, 281 Wis. 2d 395, 685 N.W.2d 831; *Maxon v. Ayers,* 28 Wis. 612 (1871).

*Healthcare, LLC*, 2002 WI 131, ¶ 10, 258 Wis. 2d 28, 654 N.W.2d 830.[17] Nevertheless,

> [a] declaration that the contract is against public policy should be made only after a careful balancing, in the light of all the circumstances, of the interest in enforcing a particular promise against the policy against enforcement. Courts should be reluctant to frustrate a party's reasonable expectations without a corresponding benefit to be gained in deterring "misconduct" or avoiding inappropriate use of the judicial system.

*Watts,* 137 Wis. 2d at 521 (citations omitted).

¶ 54. In the present case, the Sondays and Kohel entered into a Department-approved WB-5 Listing Contract that explicitly entitled Kohel to commission if the Sondays sold the listed property.

¶ 55. We discern no statute, administrative regulation, nor prior decision by any Wisconsin court that prohibits parties from entering into such brokerage contracts. We therefore conclude that public policy does not prohibit Kohel from receiving commission under this contract.

## V

¶ 56. We conclude that the WB-5 listing contract was in effect when the condemnation action was completed in July 2004. We also conclude that the transfer of title by condemnation action constitutes a sale under the WB-5 listing contract and that Kohel is entitled to 6 percent of the jurisdictional award. Finally, we conclude

---

[17] Public policy is expressed by statute, administrative regulation, and decisions by this court. *Heyde Companies, Inc. v. Dove Healthcare, LLC,* 2002 WI 131, ¶ 10, 258 Wis. 2d 28, 654 N.W.2d 830.

that public policy does not preclude Kohel from recovering the commission agreed to in the WB-5 listing contract. Accordingly, we affirm the circuit court's grant of summary judgment for Kohel. Because we conclude that the condemnation action constituted a sale under line 49 of the commission clause as opposed to a transaction under line 52, we reverse with respect to the amount of the commission to be awarded and remand the cause to the circuit court for further proceedings consistent with this opinion.

*By the Court.*— The judgment of the circuit court for Kenosha County is affirmed in part and reversed in part and the cause is remanded.

¶ 57. ANN WALSH BRADLEY, J. (*dissenting*). Absent an express provision in the listing contract, it is unclear whether a broker is entitled to a commission when there is a transfer of property by condemnation. Applying a long-standing rule of construction, I conclude that any ambiguity here should be construed against Kohel. In my view, the listing contract in this case should not be interpreted to provide that Kohel receive a commission. Accordingly, I respectfully dissent.

¶ 58. The WB-5 form listing contract used in this case includes the following provisions:

COMMISSION: Seller shall pay Broker's commission, which shall be earned if, during the term of this Listing:

1) Seller sells or accepts an offer which creates an enforceable contract for the sale of all or any part of the Property;

. . . .

4) A transaction occurs which causes an effective change in ownership or control of all or any part of the Property . . . .

490

The question becomes whether a transfer of property by condemnation is included within one of these provisions.

¶ 59. I begin with the first of the two enumerated provisions, which refers to whether the seller "sells . . . all or any part of the Property." The term "sells" is not defined in the contract.

¶ 60. To "sell" is to "transfer (property) by sale." *Black's Law Dictionary* 1365 (7th ed. 1999). *Black's* defines "sale," in turn, as "the transfer of property or title for a price." *Id.*, 1337. This definition is arguably broad enough to include a transfer by condemnation.[1] Yet, *Black's* also states that there are four elements of a "sale": "(1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised." *Id.* The nature of at least two of these four elements makes it difficult to conceive of a "sale" as an involuntary transfer such as a transfer by condemnation.[2] I doubt that a reasonable seller would expect that the sale provision here includes a transfer of property by condemnation.

¶ 61. Moreover, this court is not writing on a clean slate in seeking to interpret the term "sale" for purposes of a real estate broker's commission. A number of courts have determined that a transfer by condemnation is generally not a sale that entitles the

---

[1] The word "price" might suggest a voluntary transfer, however. *Black's* defines "price" as "[t]he amount of money or other consideration asked for or given in exchange for something else; the cost at which something is bought or sold." *Black's Law Dictionary* 1207 (7th ed. 1999).

[2] Under the general definition of "sale," *Black's* also separately defines various types of "sales," including a "compulsory sale" and a "forced sale." *Black's Law Dictionary* 1337–38 (7th ed. 1999).

broker to a commission, at least not without a specific provision to that effect in the contract. *See, e.g., Preston v. Carnation Co.,* 196 Cal. Rptr. 240, 244 (Ct. App. 1961); *Wilson v. Frederick R. Ross Inv. Co.,* 180 P.2d 226, 230 (Colo. 1947); *Shaw v. Avenue D Stores, Inc.,* 115 N.Y.S.2d 194, 197 (N.Y. Sup. Ct. 1952) ("In the absence of a specific provision in a broker's contract to the contrary, disposition of the title to real estate through condemnation proceedings does not constitute a sale, transfer or assignment."); *cf. Mealey v. Orlich,* 585 P.2d 1233, 1234 (Ariz. 1978) (broker conceded that the term "sale" in listing agreement did not cover "condemnation sale" and would not give rise to a commission); *see also* 12 Am. Jur. 2d *Brokers* § 234 (a transfer of real property to a county public transportation authority is not a "sale" that entitles a broker to a commission under an exclusive listing agreement that contains no reference to eminent domain, condemnation, taking, or sale to any governmental agency).

¶ 62. Cases such as those cited have led at least one state court of appeals to observe as follows:

> The jurisdictions that have considered the question have consistently held that, in the absence of a specific provision in the agreement or a specific indication of the parties' intent, a transfer of property by condemnation is not a sale that entitles a broker to recover a commission under a listing agreement.

*Lundstrom, Inc. v. Nikkei Concerns, Inc.,* 758 P.2d 561, 564 (Wash. Ct. App. 1988).[3]

---

[3] The majority posits that "[v]arious jurisdictions have concluded that a condemnation action cannot constitute a sale, whereas other jurisdictions have concluded that a condemnation action does constitute a sale." Majority op., ¶ 41. It "find[s] more persuasive the reasoning among the jurisdictions that consider a condemnation action to be a sale." *Id.*

¶ 63. Considering the form contract language here in light of this case law, it seems unclear, at best, whether a "sale" under the contract includes a transfer by condemnation. Given a lack of clarity, I turn to the long-standing rule of construction that applies when there is ambiguity in such a contract: a form listing contract provided by a real estate broker must be "strongly construed against the broker in case of any ambiguity or doubt." *Mansfield v. Smith,* 88 Wis. 2d 575, 594–95, 277 N.W.2d 740 (1979) (citations omitted); *accord Boutelle v. Chrislaw,* 34 Wis. 2d 665, 677, 150 N.W.2d 486 (1967); *E.M. Boerke, Inc. v. Williams,* 28 Wis. 2d 627, 634, 137 N.W.2d 489 (1965); *Dunn & Stringer Inv. Co. v. Krauss,* 264 Wis. 615, 619, 60 N.W.2d 346 (1953).

¶ 64. Applying this rule to the facts here, I conclude that the contract should not be interpreted to allow for a broker commission based on the contract's provision that a commission is due when the seller "sells . . . all or any part of the Property."

I am not persuaded by the cases that persuade the majority. None of the cases the majority cites in support of its conclusion involves real estate listing contracts or broker commissions. *See id.,* ¶ 43 (citing *United States v. 27,223.21 Acres of Land,* 589 F. Supp. 1121 (D. Colo. 1984) (involving allocation of condemnation proceeds between lessors and lessees based in part on the meaning of the term "sale" in a lease); *People ex rel. Dept. of Pub. Works v. County of Santa Clara,* 79 Cal. Rptr. 787 (Ct. App. 1969) (involving stamp tax ordinance); *United States v. Certain Parcels of Land,* 51 F. Supp. 811 (M.D. Pa. 1943) (involving the meaning of the term "sale" in a lease); *Jackson v. State,* 106 N.E. 758 (N.Y. 1914) (involving the role of fixtures in valuation of condemned property); *American Creameries Co. v. Armour & Co.,* 271 P. 896 (Wash. 1928) (involving the meaning of the term "sale" in a lease)).

The majority follows these cases, deeming other cases that involve real estate listing contracts and brokers' commissions to

¶ 65. This brings me to the other pertinent provision in the contract, and the question of whether a transfer by condemnation may be a "transaction . . . which causes an effective change in ownership or control of all or any part of the Property." To my mind, this question presents a closer call.

¶ 66. The term "transaction" is not defined by the contract provision other than as something "which causes an effective change in ownership or control of all or any part of the Property." Yet, a "transaction" under the contract seems unlikely to mean *any* such change in ownership or control. Kohel declines to assert, for example, that a broker would be entitled to a commission if the property were transferred by gift or inheritance.[4]

¶ 67. In addition, Wis. Stat. ch. 452 and Wis. Admin. Code. ch. RL 24, which pertain to the regulation of real estate practice, define "transaction" as "the sale, exchange, purchase or rental of, or the granting or acceptance of an option to sell, exchange, purchase or rent, an interest in real estate, a business or a business opportunity." Wis. Stat. § 452.01(10) (2003–04); Wis. Admin. Code § RL 24.02(18) (Jan. 2001). This definition does not appear to include a transfer by condemnation.[5]

---

be "distinguishable from the present case." Majority op., ¶ 44. In my view, cases that do involve real estate listing contracts and brokers' commissions are more on point than cases that do not.

[4] The WB-5 form listing contract makes an express exception for certain transfers of an interest in the property "by divorce judgment."

[5] This assumes, of course, that a transfer by condemnation is not a "sale."

¶ 68. I need not and do not decide whether the statutory or administrative code definition of "transaction" necessarily controls the meaning of "transaction" in the WB-5 form listing contract. Suffice it to say that the uncertain relationship between that definition and the term "transaction" in the form contract adds to the uncertainty of what this contract term means for our purposes here.

¶ 69. I am again left to construe a form listing contract term that is unclear as to whether it includes a transfer by condemnation. Thus, I again apply the long-standing rule that such a contract provided by a real estate broker is "strongly construed against the broker in case of any ambiguity or doubt." *Mansfield,* 88 Wis. 2d at 594–95. Applying that rule, I conclude that the term "transaction" in the WB-5 form listing contract should not be interpreted to include a transfer by condemnation.

¶ 70. The contract language at issue in this case is problematic for sellers who may not anticipate that a commission would be owed in the event of a condemnation.[6] Although the language may also be problematic for brokers who hope or expect to earn a commission on a transfer by condemnation, the brokers are not without recourse.

¶ 71. Brokers are more likely to anticipate the problem caused by this language and are in the best position to prevent it. They may readily protect their commissions by inserting clear, express language in their listing contracts. The interests of both sellers and brokers should generally be served when all have a

---

[6] The WB-1 form "Residential Listing Contract" contains the same terms that are at issue here in the WB-5 form "Commercial Listing Contract."

clear understanding of whether a commission is owed in the event of condemnation.

¶ 72. In sum, I conclude that the listing contract in this case should not be interpreted to provide that Kohel receive a commission where the property was transferred by condemnation. Accordingly, I respectfully dissent.